1

2

3

4

5

6

7

8                    **UNITED STATES DISTRICT COURT**

9                    **EASTERN DISTRICT OF CALIFORNIA**

10

| | |
|---|---|
| 11  HAYLEE FAITH NUTTER, | )  Case No.: 1:17-cv-00242 - JLT |
| | ) |
| 12         Plaintiff, | )  ORDER REMANDING THE ACTION PURSUANT |
| | )  TO SENTENCE FOUR OF 42 U.S.C. § 405(g) |
| 13         v. | ) |
| | )  ORDER DIRECTING ENTRY OF JUDGMENT IN |
| 14  NANCY A. BERRYHILL, | )  FAVOR OF PLAINTIFF HAYLEE FAITH NUTTER |
|  Acting Commissioner of Social Security, | )  AND AGAINST DEFENDANT NANCY A. |
| 15 | )  BERRYHILL, ACTING COMMISSIONER OF |
|         Defendant. | )  SOCIAL SECURITY |
| 16 | ) |

17          Haylee Faith Nutter asserts she is entitled to supplemental security income under Title XVI of

18  the Social Security Act.  Plaintiff argues the administrative law judge erred in evaluating the record

19  and seeks judicial review of the decision to deny her application for benefits.  Because the ALJ failed

20  to apply the proper legal standards in evaluating the record, the decision is **REMANDED** for further

21  proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

22                              **PROCEDURAL HISTORY**

23          On August 10, 2012, Plaintiff filed an application for supplemental security income, alleging

24  disability beginning May 1, 2010.  (Doc. 9-6 at 2)  The Social Security Administration denied

25  Plaintiff's application at the initial level on July 10, 2013 and upon reconsideration on February 14,

26  2014.  (Doc. 9-5 at 2-4, 12-16; Doc. 9-3 at 22)  Plaintiff then requested a hearing, which was held on

27  October 23, 2015.  (*See generally* Doc. 9-5; Doc. 9-3 at 22)  The ALJ determined Plaintiff was not

28  disabled and issued an order denying benefits on November 6, 2015.  (Doc. 9-3 at 22-30)  When the

Appeals Council denied Plaintiff's request for review on December 19, 2016 (*id.* at 2-5), the ALJ's findings became the final decision of the Commissioner of Social Security ("Commissioner").

## STANDARD OF REVIEW

District courts have a limited scope of judicial review for disability claims after a decision by the Commissioner to deny benefits under the Social Security Act. When reviewing findings of fact, such as whether a claimant was disabled, the Court must determine whether the Commissioner's decision is supported by substantial evidence or is based on legal error. 42 U.S.C. § 405(g). The ALJ's determination that the claimant is not disabled must be upheld by the Court if the proper legal standards were applied and the findings are supported by substantial evidence. *See Sanchez v. Sec'y of Health & Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938)). The record as a whole must be considered, because "[t]he court must consider both evidence that supports and evidence that detracts from the ALJ's conclusion." *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

## DISABILITY BENEFITS

To qualify for benefits under the Social Security Act, Plaintiff must establish he is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(A). An individual shall be considered to have a disability only if:

> his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B). The burden of proof is on a claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990). If a claimant establishes a prima facie case of disability, the burden shifts to the Commissioner to prove the claimant is able to engage in other substantial gainful employment. *Maounois v. Heckler*, 738 F.2d 1032, 1034 (9th Cir. 1984).

## ADMINISTRATIVE DETERMINATION

To achieve uniform decisions, the Commissioner established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 404.1520, 416.920(a)-(f). The process requires the ALJ to determine whether Plaintiff (1) engaged in substantial gainful activity during the period of alleged disability, (2) had medically determinable severe impairments (3) that met or equaled one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1; and whether Plaintiff (4) had the residual functional capacity ("RFC") to perform to past relevant work or (5) the ability to perform other work existing in significant numbers at the state and national level. *Id.* The ALJ must consider testimonial and objective medical evidence. 20 C.F.R. §§ 404.1527, 416.927.

### A.    Medical Background and Opinions[1]

On May 1, 2010, Plaintiff, then sixteen years old, visited the emergency room at UCLA, reporting that she had "no energy." (Doc. 9-9 at 8) She also reported she fainted and "felt weak beforehand." (*Id.* at 4) She "had a thorough medical evaluation," including a test for mono, which was negative. (*Id.* at 4, 6) Plaintiff was discharged with a diagnosis of "weakness," and informed that her "symptoms may be due to depression." (*Id.* at 5-6)

Later in May 2010, Plaintiff visited Dr. Aileen Matuk to establish care, reporting she felt "severe fatigue." (Doc. 9-9 at 15) She also indicated other symptoms included headaches, persistent nausea, spitting up blood, loss of appetite, night sweats, dizzy spells, tingling sensations, and muscle jerking. (*Id.* at 14)

Dr. Matuk referred Plaintiff to the Pediatric Heart Center, where she met with Dr. Avnit Golten on May 12, 2010. (Doc. 9-9 at 47) Dr. Golten performed " [a] cardiac evaluation secondary to history of syncope." (*Id.* at 45) Plaintiff said her first syncopal episode occurred when she was standing, became dizzy, and lost consciousness. (*Id.*) She told Dr. Golten that she would "get dizzy getting out of bed quite frequently," but had not lost consciousness until recently. (*Id.*) Dr. Golten noted Plaintiff was also "complaining of fatigue quite a bit," which had "affected her school work." (*Id.*) Plaintiff reported that she "had been active, able to keep up with peers during PE," but "lately [was] unable to

---

[1] The Court's analysis below addresses the physical limitations and residual functional capacity assessment by the ALJ. Accordingly, the summary of the medical record focuses on the physical impairments. However, the Court has read and considered the entirety of the medical record.

participate due to fatigue." (*Id.*)  Dr. Golten determined Plaintiff's "baseline EKG and echocardiogram [were] within normal limits." (*Id.* at 46)  She opined Plaintiff's "symptoms of fatigue and dizziness could be due to dysautonomia." (*Id.*)  Dr. Golten indicated that she directed Plaintiff "to further increase her hydration, [add] more salt to her diet and exercise involving the lower extremities." (*Id.*)  Dr. Golten noted that if Plaintiff's symptoms did not improve, then she "would like to perform a tilt table to test her for dysautonomia." (*Id.*)

After the tilt table test was performed, Dr. Aaron Banks diagnosed Plaintiff with postural orthostatic tachycardia syndrome ("POTS") in May 2010. (Doc. 9-10 at 17; Doc. 9-9 at 35)  Dr. Banks explained POTS "[is] a form of dysautonomia, which is a malfunction of the autonomic nervous system, the system that regulates all of [the] automatic functions, such as heart rate, blood pressure, temperature regulation, blood flow, etc." (Doc. 9-10 at 17)  Plaintiff received prescriptions for Florinef and Proamatine (midodrine).[2] (Doc. 9-9 at 35)  However, she was taken off the medication when she needed a tonsillectomy in December 2010. (*Id.*)  While off the medication, Plaintiff "fainted once in the shower," and "had dizziness." (*Id.*)

In February 2011, Dr. Aaron Banks noted that Plaintiff "had an interval of worsening of her symptoms after temporarily coming off her medications for [the] tonsillectomy." (Doc. 9-9 at 35)  He believed that Plaintiff would "be able to recover over time" because her symptoms had been "well controlled" prior to being taken off the medication. (*Id.* at 36)  To accelerate Plaintiff's recovery, Dr. Banks directed Plaintiff to receive IV treatments every other day for a week, and he requested her insurance approve Provigil "to improve her energetics and wakefulness." (*Id.*)

In April 2011, Dr. Banks noted Plaintiff's reported symptoms included random palpitations; "dizziness after showing only;" pre-syncopal symptoms 1-2 times per week;  headaches; and "[f]atiguability without insomnia," for about eight hours each day. (Doc. 9-9 at 37)  Dr. Banks noted the insurance company did not approve Provigil, and he added "atenolol to increase transmission at the neuromuscular junction and minimize her palpitations." (*Id.* at 37-38)  He opined Plaintiff's

---

[2] "Proamatine is the brand name for a medication used to treat individuals who experience a drop in blood pressure upon standing by stimulating the contraction of capillaries and arteries." *Crandall v. Astrue*, 2011 U.S. Dist. LEXIS 115216, n.8 (E.D. Pa. Oct. 5, 2011) (citing *Dorland's Illustrated Medical Dictionary* 1882 (31st ed. 2007) at 919, 1183, 1538, 2056.

4

"symptoms [were] of decent control," but noted the other medications would "be adjusted to ameliorate some of her symptoms," and directed Plaintiff to take florinef one hour prior to any sports activity. (*Id.* at 38) In addition, Dr. Banks opined Plaintiff should have "rehabilitation… [to] address proprioception and lower extremity strength training." (*Id.*) She was directed to return to the Heart Center within six months. (*Id.*)

In August 2011, Dr. Banks noted Plaintiff continued to report palpitations; fatigue; and dizziness in the morning upon wakening, but "usually not during the day." (Doc. 9-9 at 39) Upon examination, Dr. Banks found Plaintiff had a "low to medium itch vibratory mid-systolic ejection murmur," but found "no diastolic murmurs." (*Id.*) He opined Plaintiff was "doing better than before," and "her level of functionality [was] at the best [it had] been recently." (*Id.* at 40) Dr. Banks believed Plaintiff "would benefit most from physical therapy, and continued aggressive IV hydration." (*Id.*) Because Plaintiff "had a good response to IV hydration," Dr. Banks recommended Plaintiff visit Northwest Urgent Care to receive an IV treatment that day. (*Id.*) He indicated Plaintiff needed physical therapy for her activities of daily living, bone density loss, "and proprioceptive retaining." (*Id.*)

On December 20, 2011, Dr. Banks noted Plaintiff reported she had "[o]nly fainted once since the last visit." (Doc. 9-9 at 41) Plaintiff stated her symptoms included: dizziness "when she arises from sleep;" "[n]ausea but no fainting," often in the evening; low energy; and "[m]ental fogginess by a large degree." (*Id.*) Plaintiff stated that her diet included "1 large meal per day." (*Id.*) Dr. Banks again found Plaintiff had a mid-systolic ejection murmur, and no diastolic murmurs. (*Id.*) Dr. Banks opined Plaintiff was "doing overall marginally due to dietary etiology combined with an underlying poor neurocardiovascular physiology." (*Id.* at 42) He noted: "Most beneficial would be for her to return to physical therapy maintain 64 ounces per day of electrolyte fluids, and eat three balanced meals per day. Haylee is encouraged to aggressively pursue these, which she seems very motivated to do." (*Id.*)

On December 31, 2011, Plaintiff visited the emergency department at Grossmont Hospital, complaining of "nausea, dizziness and upper [abdominal] pain." (Doc. 9-9 at 28) She indicated that she was diagnosed with POTS, and the associated symptoms included weakness, dizziness, and an irregular heartrate. (*Id.* at 30) She also indicated that she "had trouble speaking" prior to arrival at the hospital. (*Id.*) A CT scan of her abdomen did not show an acute abnormality, though there was "a

small amount of likely physiologic pelvic free fluid." (*Id.* at 34)  She was treated with IV fluids and Toradol.  (*Id.* at 25)

Plaintiff returned to Grossmont Hospital four days later, "complaining of [a] history of dysautonomia." (Doc. 9-9 at 25)  She reported that she had a fever, nausea, and trouble speaking.  (*Id.*)  Dr. Mark Schwab opined Plaintiff's "symptoms [were] moderate."  (*Id.*)  According to Dr. Schwab, Plaintiff was not in acute distress, though she exhibited mild tenderness in the abdomen.  (*Id.* at 26)  A CT scan of Plaintiff's abdomen showed "some prominent lymph nodes," which Dr. Schwab believed "may reflect some mild infection."  (*Id.* at 27)  Dr. Schwab diagnosed Plaintiff with hypokalemia, and Plaintiff received IV fluids and antiemetics, as well as a prescription for Zofran for home.  (*Id.*)

Although Plaintiff had been directed to return to the Pediatric Heart Center in six months, she returned on January 10, 2012, after her hospital visits.  (Doc. 9-9 at 42, 43)  Dr. Banks noted Plaintiff had not been compliant with the hydration recommendations or physical therapy since her last visit on December 20. (*Id.* at 43, 70)  He again opined Plaintiff "need[ed] to increase her hydration with electrolyte containing fluids… [and] begin physical therapy for proprioception re-training."  (*Id.*)

In August 2012, Plaintiff told her therapist, Joan Knowlden, M.S., M.F.T., that she was doing yoga four times each week.  (Doc. 9-9 at 57)  Ms. Knowlden also noted Plaintiff was working on her SSI application at that time.  (*Id.*)

In February 2013, Dr. Banks performed a "follow-up cardiac evaluation."  (Doc. 9-9 at 68)  Plaintiff reported she had not fainted, had less dizziness, and no diaphoresis.  (*Id.*)  Dr. Banks also noted that Plaintiff's hydration level was "[o]ptimal at 64 ounces per day," and her diet was optimal and balanced.  (*Id.*)  Upon examination, Dr. Banks found "no systolic or diastolic murmurs."  (*Id.* at 69)  Dr. Banks opined Plaintiff was "doing overall well, with minimal symptoms."  (*Id.*)  However, she was "unable to tolerate any weaning of her midodrine."  (*Id.*)

Plaintiff was working as a "resort reservationist" in Alaska in July 2013, when she visited a clinic, complaining of chest congestion, cough, and sore throat.  (Doc. 9-9 at 96; Doc. 9-10 at 3)  She was diagnosed with acute bronchitis.  (Doc. 9-9 at 96)  Two days later, Plaintiff returned and said she felt "like her chest congestion [was] improving," but she had the "worse (sic) headache she has ever ha[d]" and was nauseous.  (*Id.*)  She received an IV treatment, and directed to rest.  (*Id.* at 97)  Leon

Koenick, PA-C, recommended that Plaintiff "get[] a high chair while working at [a] front desk to help minimize orthostatic tachycardia symptoms." (*Id.*)

In August 2013, after returning to California, Plaintiff visited an urgent care center, complaining of weakness. (Doc. 9-10 at 11) Dr. R. Chavez determined Plaintiff was suffering from dehydration related to POTS, and Plaintiff received an IV treatment. (*Id.*) Two days later, Plaintiff had an appointment with Dr. Banks at the Pediatric Heart Center (Doc. 9-9 at 86) She told Dr. Banks she had "poor stamina," and was experiencing "frequent[] dizziness," though she had not fainted. (Doc. 9-9 at 86) Dr. Banks opined that Plaintiff had "interval worsening, and need[ed] to be aggressively treated to blunt her acute dysautonomia." (*Id.* at 87) He also indicated that he would consider adding Adderall to Plaintiff's medication regimen—which included Midodrine, Florenef, and Atenolol— after one month. (*Id.*) Dr. Banks informed Dr. Matuk in a letter that he believed Plaintiff "should remain off work for the next year," and that he wrote "a letter to this effect." Further, he indicated Plaintiff "should consider SSI for employment/financial concerns." (*Id.*)

On September 20, 2013, Plaintiff reported less dizziness and "[d]ecreased mental fogginess by a large degree." (Doc. 9-9 at 88) Dr. Banks found Plaintiff had no heart murmurs and reviewed the results of an electrocardiogram and echocardiogram. (*Id.* at 89) He opined Plaintiff "had improved in the waning of midodrine's effect," but continued to show "poor energetics and poor focusability." (*Id.*)

Dr. B. Sheehy reviewed Plaintiff's records and completed a physical residual functional capacity assessment on December 12, 2013. (Doc. 9-4 at 19-21) Dr. Sheehy opined that Plaintiff did not have exertional limitations, but was did have postural and environmental limitations. (*Id.* at 20) Specifically, Dr. Sheehy determined Plaintiff could occasionally climb raps and stairs; but she could never climb ladders, ropes, and scaffolds. (*Id.* at 20) Dr. Sheehy indicated the postural limits were in place due to Plaintiff's POTS, and indicated a belief that Plaintiff was "much improved" though she "still [had] dizziness on standing at times." (*Id.* at 20) In addition, Dr. Sheehy indicated Plaintiff should "[a]void even moderate exposure" to hazards such as machinery and heights, as "[s]yncope precautions." (*Id.* at 21)

On September 3, 2014, Dr. Banks directed Plaintiff receive "peripheral IV fluid infusion[s] every three to four days until [her] symptoms lessen[ed]." (Doc. 9-10 at 18) Dr. Banks also wrote a

letter in which he noted:

> Patients with POTS often present with numerous symptoms. These include intermittent rapid heart rates, very low blood pressure, dizziness, low-grade fevers, constipation, diarrhea, abdominal pain, and nausea. Patient has experienced each of these symptoms at one time or another. Prolonged periods of standing or sitting can exacerbate these symptoms.

(*Id.* at 17) Dr. Banks opined Plaintiff was "to be excluded from work due to her physical condition for the term of one year, [until] September of 2015." (*Id.*)

On February 18, 2015, Plaintiff visited an urgent care facility, reporting she felt dizzy. (Doc. 9-10 at 13) Dr. Ostrom found Plaintiff was "near syncope" and she received a hydration treatment. (*Id.*) A few days later, Plaintiff had a checkup with Dr. Banks, who noted Plaintiff reported having a syncope episode "while walking to the bathroom" in November. (*Id.* at 19) Plaintiff also reported she frequently dizzy, had a poor energy level, and mental fogginess. (*Id.*) Dr. Banks noted Plaintiff had "been doing well from a cardiac perspective, and [her] parents expresse[d] no complaints." (*Id.*) He noted Plaintiff was not regularly receiving IVs, and again prescribed treatments "every three to four days" until her symptoms lessened. (*Id.* at 19, 21) In addition, Dr. Banks opined Plaintiff had "[c]hronic social dysfunction with recurrence [of] dizziness and fainting." (*Id.* at 20) He also referred Plaintiff to a rheumatologist to determine whether she had chronic fatigue syndrome. (*Id.*)

In March 2015, Plaintiff visited the Advanced Rheumatology & Arthritis Center for an evaluation by Dr. Jim Kim. (Doc. 9-12 at 28) Dr. Kim noted Plaintiff was "sensitive to touch" and recommended a comprehensive rheumatologic workup. (*Id.*)

In April 2015, Dr. Banks wrote a letter requesting that Plaintiff be excused from jury duty. (Doc. 9-10 at 22) He noted Plaintiff suffered from POTS and "chronic social dysfunction with recurrence dizziness and fainting." (*Id.*) He believed Plaintiff was "unable to physically attend" jury duty. (*Id.*)

Dr. Banks completed a cardiac residual functional capacity questionnaire on May 28, 2015. (Doc. 9-12 at 19) Dr. Banks noted that Plaintiff was diagnosed with POTS, and indicated her symptoms included: chest pain, shortness of breath, fatigue, weakness, palpitations, dizziness, and syncope. (*Id.*) He indicated Plaintiff had "marked limitation of physical activity." (*Id.*) Dr. Banks explained that "physical stress [such as] low intensity daily activity brings on severe complications with severe

exhaustion and catatonia" for 12-15 hours. (*Id.* at 20) According to Dr. Banks, Plaintiff's cardiac symptoms were severe enough to constantly interfere with her concentration and attention. (*Id.*) He noted Plaintiff was receiving "maximal therapy," and her medication regimen included taking midodrine every three hours, florinef each morning, and atenol each morning. (*Id.*) Dr. Banks opined Plaintiff could walk one and a half city blocks at one time, but did not indicate any limits with sitting and standing. (*Id.* at 21) He indicated Plaintiff should never perform postural activities, such as twisting, bending, crouching, crawling, or climbing. (*Id.* at 22) Dr. Banks also believed Plaintiff needed to avoid all exposure to extreme temperatures, wetness, humidity, noise, fumes, odors, dust, poor ventilation, and hazards. (*Id.*) He opined Plaintiff would "continuously" need unscheduled breaks during an eight-hour day, and twice noted: "I am not recommending work." (*Id.* at 21) Dr. Banks concluded Plaintiff was likely to miss more than four days of work per month. (*Id.* at 22)

Plaintiff was referred to Rheumatology Services Medical Group, where Dr. Jeffrey Bacon conducted tests "to help rule out a possible autoimmune cause of [Plaintiff's] feelings of general malaise. (Doc. 9-12 at 30) On June 1, 2015, Dr. Bacon found Plaintiff had "16/18" positive fibromyalgia tenderpoints. (*Id.* at 35) He diagnosed Plaintiff with fibromyalgia and prescribed Neurontin. (*Id.*) However, Plaintiff was unable to tolerate the Neurontin, and it was discontinued. (Doc. 9-14 at 24)

## B. Administrative Hearing Testimony

Plaintiff testified before the ALJ on October 23, 2015. (*See* Doc. 9-3 at 36-37) She reported that she was twenty-two years old and lived alone, though her mother supported her. (*Id.* at 40) She believed she was unable to work because she had "no physical strength to maintain any type of responsibilities." (*Id.* at 40)

When asked to describe her typical day, Plaintiff stated:

> I usually wake up and take my medicine before I get out of bed. I usually have to wait 20 to 30 minutes to feel able to get and go around, brush my teeth, get ready, wait for the medicine to kick and depending on how I feel… on that particular day if I do have an appetite and if I do have the energy to make myself breakfast I do but that … probably happens maybe twice a week where that's a good day and I relax most days, try to go outside for some parts of the day. I pet my cats and I try to read but sometimes I'm not able to focus when I read.

(*Id.* at 41) Plaintiff said she did not "do any type of upkeep" in her home. (*Id.* at 44) She explained she

had to choose which tasks to accomplish, because if she were to get a load of clothes together to do laundry when her mom was unavailable, then she "wouldn't have enough energy to cook [herself] food later." (*Id.*) She stated the most exertion she set forth during the day was making her bed, which happened rarely, or cooking. (*Id.* at 47)

She reported that her IV treatments took about "four and a half hour[s]" to be administered, which occurred once or twice a week. (Doc. 9-3 at 47) She stated that after a treatment, she "would feel very out of it for at least and hour." (*Id.*) Plaintiff said she spent the rest of the day "just laying down [and] trying to recover," because she had "nausea, lack of appetite [and] dizziness." (*Id.* at 48) However, as of the hearing date Plaintiff had stopped receiving IV treatments." (*Id.* at 49) She stated that she was "mostly bedridden" and Dr. Banks directed her to stay "in bed for at least two days a week hydrating." (*Id.*)

Plaintiff acknowledged that she held a summer job in Alaska, stating that her psychologist had "encouraged [her] to just… keep trying… to do something productive," which is when she took the job. (Doc. 9-3 at 42) However, Plaintiff reported also that Dr. Banks "didn't want [her] to go and work in Alaska." (*Id.*) Plaintiff said she 'ended up missing a lot of work" and her "employers were not happy with [her]." (*Id.*) She stated that she "just couldn't keep up" with working, and when she pushed herself to try, she was unable to work the next day because she "needed to rest" and have a recovery time. (*Id.*) Plaintiff reported that she "ended up in a clinic in Alaska," and "ended up having to come home early from [the] job." (*Id.*) She explained that prior to going to Alaska, she was taking Midodine every four hours, but upon her return, Dr. Banks "pushed it up to every three hours because [she] wasn't responding as much to the medication." (*Id.* at 43)

C. **The ALJ's Findings**

Pursuant to the five-step process, the ALJ determined Plaintiff did not engage in substantial gainful activity after the application date of July 31, 2012. (Doc. 9-3 at 24) At step two, the ALJ found Plaintiff's severe impairments included: "fibromyalgia and postural orthostatic tachycardia syndrome (POTS)." (*Id.*) At step three, the ALJ determined Plaintiff did not have an impairment, or combination of impairments, that met or medically equaled a Listing. (*Id.* at 24-26) Next, the ALJ determined:

> [T]he claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations: the claimant cannot

use ladders, ropes or scaffolds.  She can occasionally climb ramps and stairs, but must avoid all work at heights or near hazards.

(*Id.* at 26)  Based upon this RFC, the ALJ concluded "there are jobs that exist in significant numbers in the national economy that the claimant can perform."  (*Id.* at 29)  Therefore, the ALJ concluded Plaintiff was not disabled as defined by the Social Security Act.  (*Id.* at 30)

## DISCUSSION AND ANALYSIS

Plaintiff asserts the ALJ erred in evaluating the medical record and rejecting the opinions of Dr. Banks.  (Doc. 15 at 7-13)  The Defendant counters that "the ALJ articulated persuasive reasons, supported by substantial evidence, for discounting Dr. Banks' opinion."  (Doc. 21 at 17)

**A.     ALJ's Evaluation of the Medical Evidence**

In this circuit, the courts distinguish the opinions of three categories of physicians: (1) treating physicians; (2) examining physicians, who examine but do not treat the claimant; and (3) non-examining physicians, who neither examine nor treat the claimant.  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996).  Generally, the opinion of a treating physician is afforded the greatest weight but it is not binding on the ultimate issue of a disability.  *Id.*; *see also* 20 C.F.R. § 404.1527(d)(2); *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).  Further, an examining physician's opinion is given more weight than the opinion of non-examining physician.  *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir. 1990); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  Thus, the courts apply a hierarchy to the opinions offered by physicians.

A treating physician's opinion is not binding upon the ALJ, and may be discounted whether or not another physician contradicts the opinion.  *Magallanes*, 881 F.2d at 751.  An ALJ may reject an *uncontradicted* opinion of a treating or examining medical professional only by identifying "clear and convincing" reasons.  *Lester*, 81 F.3d at 831.  In contrast, a *contradicted* opinion of a treating or examining professional may be rejected for "specific and legitimate reasons that are supported by substantial evidence in the record."  *Id.*, 81 F.3d at 830.

When there is conflicting medical evidence, "it is the ALJ's role to determine credibility and to resolve the conflict."  *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984).  The ALJ's resolution of the conflict must be upheld when there is "more than one rational interpretation of the evidence."  *Id.*; *see*

*also Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) ("The trier of fact and not the reviewing court must resolve conflicts in the evidence, and if the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ"). Plaintiff contends the ALJ erred in rejecting opinions offered by treating physician Dr. Banks. Because Dr. Sheehy offered opinions that conflicted with limitations identified by Dr. Banks, the ALJ was required to set forth specific and legitimate reasons to support her rejection of Dr. Bank's opinions. *See Lester*, 81 F.3d at 830.

Examining the medical evidence, the ALJ explained she gave "little weight to the report and opinion of the claimant's treating physician, Dr. Banks, who asserts the claimant is unable to engage in any work activities for a period of one year beginning in September 2015 due to postural orthostatic tachycardia syndrome (POTS)." (Doc. 9-3 at 27, citing Exh. 12F, p. 3[3]) In relevant part, the ALJ explained the weight given as follows:

> Dr. Banks completed a cardiac residual functional capacity (RFC) assessment of the claimant and asserted that her POTS condition caused syncope and that the claimant was incapable of even low stress positions and had an adjustment condition (Exhibit 12F, pages 1-2). Dr. Banks found that the claimant could not lift any weight, perform any postural movements or activities, has to avoid all environmental exposures, and would miss more than four days of work monthly (Exhibit 12F, pages 3-4). Such extreme limitations are wholly unsupported by the clinical, diagnostic and examining record and can be given little weight. Dr. Banks (sic) assertion that the claimant can perform no exertional activities, even at the sedentary level, are incredible. Further, there is an indication in the record that suggests advocacy on the part of Dr. Banks in supporting the claimant's application for SSI payments (Exhibit 8F, page 3). It is not clear how the claimant's social functioning is poor. Mental health treatment notes show the claimant successfully finished high school, had a boyfriend and living on her own (Exhibit 5F).
>
> Dr. Banks (sic) own treatment notes contradict his incomplete capacity assessment of the claimant. Dr. Banks noted that in February 2015 that the claimant was doing well from a cardiac perspective, which no complaints (Exhibit 12F). The claimant's cardiac condition has clearly been controlled with prescription medication (Exhibit 12F, page 6) and IV fluid infusion (IVFs) as needed to lessen her symptoms (Exhibit 12F, pages 4, 6-7). Further, Dr. Banks noted the claimant was not taking IVFs regularly, indicating her condition is under good control (Exhibit 12F, page 5). In 2013, he finds the claimant is "doing well overall" and has "minimal symptoms" (Exhibit 6F, page 2.) Further, the remainder of the medical record and the claimant's own activities of daily living, such as completing high school while living alone and performing yoga (Exhibits 5F, pages 6, 10) contradict the extreme limitations proffered by Dr. Banks.

(*Id.* at 27)

---

[3] Although the ALJ cites Exhibit 12F in addressing the opinion of Dr. Banks, it appears she is referring to the questionnaire completed on May 28, 2015, which is Exhibit 15F.

Having rejected the opinion of Plaintiff's treating physician, the ALJ she adopted the limitations identified in 2013 by Dr. Sheehy, a non-examining physician. (*See* 9-3 at 25) (explaining the physical residual functional capacity assessment was "consistent with the findings of the State agency Disability Determination Service (DDS) source"). Plaintiff contends the ALJ's reasons for rejecting the opinion of Dr. Banks in favor of the limits identified by Dr. Sheehy are not supported by the record. (Doc. 16 at 10-14)

### 1.    Advocacy by a physician

As an initial matter, an ALJ may not reject a treating physician's opinion based on the assumption that a treating physician has a natural tendency to advocate for his patients, but may do so if there is evidence that the physician is, in fact, acting as an advocate. *See Lester*, 81 F.3d at 832 (holding the Commissioner "may not assume that doctors routinely lie in order to help their patients collect disability benefits" but "may introduce evidence of actual improprieties"); *Matney v. Sullivan*, 981 F.2d 1016, 1020 (9th Cir. 1992) (holding the ALJ properly determined treating physician's opinions "were entitled to less weight" because evidence showed that physician "had agreed to become an advocate and assist in presenting a meaningful petition for Social Security benefits"); *Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996) (ALJ properly discounted treating physician's report obtained solely for purposes of administrative hearing).

The ALJ rejected the opinions of Dr. Banks, in part, because of an "indication in the record that suggests advocacy on the part of Dr. Banks in supporting the claimant's application for SSI payments." (Doc. 9-3 at 27, citing Exh. 8F, p. 3) Specifically, in document cited by the ALJ—which was a letter dated August 27, 2013, from Dr. Banks to Dr. Matuk — Dr. Banks noted Plaintiff had "been having poor stamina," was "frequently dizzy," and had "interval worsening" of her symptoms after she worked in Alaska. (Doc. 9-9 at 86-87) Dr. Banks informed Dr. Matuk that Plaintiff "need[ed] to be aggressively treated," and he believed Plaintiff "should remain off work for the next year." (*Id.* at 87) Dr. Banks stated: "I have written a letter to this effect, and she should consider SSI for employment/financial concerns." (*Id.*)

Significantly, the ALJ does not identify any evidence in the record supporting a conclusion that Dr. Banks agreed to become an advocate for Plaintiff to receive Social Security benefits, or that Dr.

Banks offered the opinion for the purpose of obtaining benefits. Indeed, statement was made in a letter from Dr. Banks to Dr. Matuk, and well after Plaintiff had filed her application for supplemental security income on August 10, 2012 (*see* Doc. 9-6 at 2). Further, there is no indication in the record that the limitations identified by Dr. Banks should be rejected because they were an "accommodation in aid of [Plaintiff's] disability claim." *See Perez v. Chater,* 17 F.Supp.2d 1115, 1123 (C.D. Cal. 1997). Because the record does not support the inference of advocacy, and this reason set forth by the ALJ does not support the decision to give less weight to the limitations identified by Dr. Banks.

### 2. Level of activity

The Ninth Circuit determined an ALJ may reject an opinion when the physician identifies restrictions that "appear to be inconsistent with the level of activity that [the claimant] engaged in." *Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001); *see also Fisher v. Astrue*, 429 Fed. App'x 649, 652 (9th Cir. 2011) (concluding the ALJ set forth specific and legitimate reasons for rejecting a physician's opinion where the assessment was based upon the claimant's subjective complaints, and limitations identified by the doctor conflicted with the claimant's daily activities).

In this case, the ALJ opined that "the claimant's own activities of daily living, such as completing high school while living alone and performing yoga (Exhibits 5F, pages 6, 10) contradict the extreme limitations proffered by Dr. Banks." (Doc. 9-3 at 27, citing Doc. 9-9 at 53, 57) Notably, however, it appears that Plaintiff completed high school prior to the relevant time period, which began when she was nearly nineteen years old and applied for benefits on August 10, 2012. (*See* Doc. 9-6 at 2) There also is a question of whether Plaintiff was, in fact, living alone when she moved out of her family home because the very treatment notes cited by the ALJ indicate Plaintiff informed her therapist that she "lived w/ sister and fiancé." (Doc. 9-9 at 53)

Further, it is unclear how Plaintiff's report in August 2012 that she was doing yoga four times each week contradicts the physical limitations identified by Dr. Banks in September 2015. There is no information regarding the level of exertion, the duration, or the type of yoga Plaintiff was performing. On this scant record related to Plaintiff's level of activity—particularly where the only activities identified by the ALJ occurred several years before Dr. Banks completed the cardiac questionnaire— the Court is unable to find Plaintiff's level of activity was inconsistent with the limitations identified by

Dr. Banks. Consequently, this factor does not support the ALJ's decision to give less weight to the treating cardiologist's opinion.

### 3. Plaintiff's prescribed treatment

The ALJ indicates Plaintiff received "conservative treatment" (Doc. 9-3 at 28), which included prescription medication [citation] and IV fluid infusions… as needed to lessen her symptoms." (*Id.* at 27, citing Exh.12F, pp. 4, 6-7 [Doc. 9-10 at 18, 20-21]) In addition, the ALJ observed that Dr. Banks opined Plaintiff "would benefit from physical therapy," which the ALJ believed was "in direct contradiction with his capacity assessment of the claimant in which she found she could perform no physical activities." (Doc. 9-3 at 28)

Importantly, despite the ALJ's characterization of the treatment as "conservative," Dr. Banks indicated on the cardiac questionnaire that Plaintiff was receiving "maximal therapy." (Doc. 9-12 at 20) Similarly, he informed Dr. Matuk that Plaintiff needed "aggressive IV hydration" in August 2011 (Doc. 9-9 at 40) and "aggressive" treatment in August 2013. (Doc. 9-9 at 87) Though the ALJ does not address the requirements of the IV treatments, it is clear from the record that each treatment—which Dr. Banks believed Plaintiff needed every three or four days when her symptoms increased— could take four or five hours for the IV hydration treatment to be fully administered. (*See, e.g.*, Doc.9-10 at 18; Doc. 9-11 at 18, 20, 45; Doc. 9-13 at 25; Doc. 9-14 at 3).

In addition, there is no indication in the record that the limitations identified by Dr. Banks are contradicted by the physical therapy prescribed for Plaintiff. In August 2011, Dr. Banks indicated Plaintiff needed physical therapy for her activities of daily living, bone density loss, "and proprioceptive retaining." (Doc. 9-9 at 39) Again in January 2012, he indicated Plaintiff "need[ed] to increase her hydration with electrolyte containing fluids… [and] begin physical therapy for proprioception re-training." (*Id.* at 42, 43) Notably, there is no information in the record regarding what level of exertion or postural movements—if any— were required of Plaintiff during physical therapy, or whether she was able to sustain such actions.

Moreover, the ALJ did not address whether such a recommendation is a typical treatment for POTS. However, other courts have noted that physicians have referred POTS patients to physical therapy. *See, e.g.*, *Hardman v. Berryhill*, 251 Soc. Sec. Rep. Service 472, 2018 U.S. Dist. LEXIS

28197 at, *3 (N.D. Ind., Feb. 22, 2018) (indicating the claimant, who was diagnosed with POTS, was referred to physical therapy in an effort "to resolve the symptoms of dizziness"); *Levin v. Colvin*, 2016 U.S. Dist. LEXIS 168817, at *25-27 (R.I. Dist. Nov. 16, 2016) (finding the ALJ erred in rejecting the opinion of a recognized expert in the treatment of POTS, where the physician "actively monitored" the claimant's physical therapy sessions, and therapy notes "include[d] the warning that, due to POTS, [the] heart rate and blood pressure must be monitored during standing and activity").

Given the ALJ's failure to address whether the treatment prescribed was appropriate for, or in conflict with, the diagnosis of POTS, the Court finds the treatment prescribed does not support the decision to give less weight to the opinion of Dr. Banks.

4.    Treatment notes

The Ninth Circuit determined an opinion may be rejected where there are inconsistencies within a physician's reports. *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 603 (9th Cir. 1999). However, it is an error to read a treating physician's notes "selective[ly]" rather than "in full and in context." *Holohan v. Massanari*, 246 F.3d 1195, 1204-05 (9th Cir. 2001). The Ninth Circuit determined also that an ALJ cannot properly reject a treating physician's opinion as being "inconsistent" with his or her treatment notes if the "inconsistency" is only, for instance, that the claimant showed improvement during treatment. *Id.*

In *Holohan*, the ALJ rejected the treating physician's opinion that the claimant suffered from "marked" impairments with respect to "performance of any work activity due to anxiety/panic attacks and poor concentration." *Holohan*, 246 F.3d at 1204-05. The ALJ rejected the opinion as "totally inconsistent with [the physician's] own treatment notes and records . . ." *Id.* The ALJ stated the treatment notes "indicate[d] control of panic attacks" with medication; a "great improvement" in the claimant's condition; and the physician's finding that the panic attacks increased with inactivity, such that she was happy when she joined the YMCA. *Id.* Upon appeal, the Ninth Circuit found the ALJ erred in rejecting the treating physician's opinion on these grounds. *Id.* The Court found the ALJ was too "selective" in his reliance on the treating physician's notes, and "exaggerate[d]" the contents. *Id.* at 1205. The Court's review of the record confirmed that, while the treatment notes revealed the claimant was "doing better," her panic attacks were only "15% better." *Id.* Similarly, the physician never

16

identified a "great improvement" in the claimant's condition. *Id.* The Court concluded the physician's notes "must be read in context of the overall diagnostic picture he draws," and "some improvement does not mean that the person's impairments no longer seriously affect her ability to function in a workplace." *Id.*; *see also Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1201 (9th Cir. 2008) (citing *Holohan* and holding treatment notes reflecting a patient's "improvement" did not undermine the physician's repeated conclusions and diagnosis).

Likewise, here it appears the ALJ failed to consider all of the treatment notes. For example, while Dr. Banks indicated in February 2013 that Plaintiff was "doing overall well, with minimal symptoms," later that same year Dr. Banks opined that Plaintiff's condition had worsened, and she "need[ed] to be aggressively treated to blunt her acute dysautonomia." (Doc. 9-9 at 68, 87) However, the ALJ did not acknowledge Dr. Banks' opinion that Plaintiff had worsened in August 2013. (*See* Doc. 9-3 at 27) In addition, the ALJ observed, "Dr. Banks noted the claimant was not taking IVFs regularly," and the ALJ concluded this "indicat[ed] her condition is under good control." (Doc. 9-3 at 27, citing Exh. 12F, pg. 5 [Doc. 9-10 at 19]) However, the ALJ's conclusion is undermined by the fact that *the same day*, Dr. Banks determined Plaintiff needed to have an "IV fluid infusion every three to four days until [her] symptoms lessen[ed]." (Doc. 9-10 at 21)

Finally, to the extent that the treatment notes indicate Plaintiff's condition was "controlled with prescription medication" as the ALJ stated (Doc. 9-3 at 27), the ALJ appears to erroneously equate "control" with "functionality" and the ability to sustain work. *See e.g., Richardson v. Astrue*, 2011 U.S. Dist. LEXIS 132843 at *18-19, 172 Soc. Sec. Rep. Service 69 (C.D. Cal. Nov. 17, 2011) (observing the treatment notes indicated the plaintiff's condition was "stable," yet she had "an active disease which require[d] aggressive medications" and finding the ALJ erred by "improperly equat[ing] stability with functionality"); *Lule v. Berryhill*, 2017 U.S. Dist. LEXIS 19392, at *18 (E.D. Cal. Feb. 9, 2017) (finding the ALJ erred in evaluating the record because the stability of a condition alone does not support a conclusion that the claimant is "able to perform work for an eight-hour day").

Because the ALJ engaged in selective reading of the treatment notes, and failed to discuss evidence of Plaintiff's condition worsening, the Court finds the ALJ erred in rejecting the limitations of Dr. Banks as inconsistent with the treatment notes.

The Ninth Circuit has determined that an ALJ may reject limitations "unsupported by the record as a whole." *Mendoza v. Astrue*, 371 Fed. Appx. 829, 831-32 (9th Cir. 2010) (citing *Batson v. Comm'r of the Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2003)). However, when an ALJ believes the treating physician's opinion is unsupported by the objective medical evidence, the ALJ is required to "set[] out a detailed and thorough summary of the facts *and conflicting clinical evidence*, stating his interpretation thereof, and making findings." *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986) (emphasis added); *see also Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) ("The ALJ must do more than offer his conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct.").  For example, an ALJ may also discount the opinion of a treating physician by identifying an examining physician's findings to the contrary and identifying the evidence that supports that finding. *See, e.g., Creech v. Colvin*, 612 F. App'x 480, 481 (9th Cir. 2015).

The ALJ opined the limitations identified by Dr. Banks were "wholly unsupported by the clinical, diagnostic and examining record," yet failed to identify specific findings in the record regarding Plaintiff's physical abilities that contradicted the findings of Dr. Banks.  For example, the ALJ does not identify any objective evidence that demonstrates Plaintiff can tolerate walking more than one and a half blocks at time, and could perform postural activities such as twisting, bending, crouching, crawling, or climbing.  (*See* Doc. 9-3 at 27; Doc. 9-12 at 19)  In setting forth Plaintiff's limitations, Dr. Banks explained that with POTS, "physical stress [such as] low intensity daily activity brings on severe complications with severe exhaustion and catatonia" for more than 12 hours."  (Doc. 9-12 at 20)  However, the ALJ failed to address this explanation from Dr. Banks.  Likewise, the ALJ failed to address his recommendation in September 2014 that Plaintiff not work because "[p]rolonged periods of standing or sitting can exacerbate the[] symptoms" of POTS.  (Doc. 9-10 at 17).

Rather than identify evidence that conflicted with specific limitations identified by Dr. Banks, the ALJ offered only a summary of the medical record and her conclusion that it did "not support Dr. Banks (sic) assertion that the claimant is gravely disabled."  (*See* Doc. 9-3 at 27-28) However, this conclusion "does not achieve the level of specificity [that] prior cases have required." *Embrey v. Bowen*, 849 F.2d 418, 421-22 (9th Cir. 1988). Because the ALJ failed to identify specific evidence that

conflicted with the limitations identified by Dr. Banks, the ALJ erred in evaluating the medical record and rejecting his opinion.

## B.    Remand is Appropriate

The decision whether to remand a matter pursuant to sentence four of 42 U.S.C. § 405(g) or to order immediate payment of benefits is within the discretion of the district court. *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000). Except in rare instances, when a court reverses an administrative agency determination, the proper course is to remand to the agency for additional investigation or explanation. *Moisa v. Barnhart*, 367 F.3d 882, 886 (9th Cir. 2004) (citing *INS v. Ventura*, 537 U.S. 12, 16 (2002)). Generally, an award of benefits is directed when:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Smolen v. Chater*, 80 F.3d 1273, 1292 (9th Cir. 1996). In addition, an award of benefits is directed where no useful purpose would be served by further administrative proceedings, or where the record is fully developed. *Varney v. Sec'y of Health & Human Serv.*, 859 F.2d 1396, 1399 (9th Cir. 1988). The Ninth Circuit explained that "where the ALJ improperly rejects the claimant's testimony regarding his limitations, and the claimant would be disabled if his testimony were credited," the testimony can be credited as true, and remand is not appropriate. *Lester*, 81 F.3d at 834.

The ALJ failed to identify legally sufficient reasons for rejecting the physical limitations assessed by Plaintiff's treating cardiologist, Dr. Banks, related to the POTS condition. Because the ALJ failed to resolve the conflicts in the record regarding Plaintiff's limitations, the matter should be remanded for the ALJ to re-evaluate the medical evidence. *See Moisa*, 367 F.3d at 886; *see also Huey v. Comm'r of Soc. Sec.,* 2018 WL 1477582, at *4-5 (W.D. Mi. Mar. 27, 2018) (remanding the matter for further proceedings where the ALJ rejected the limitations identified by the claimant's treating cardiologist, who indicated that due to POTs, the claimant could only lift up to ten pounds occasionally, required a climate-controlled environment, and had postural limitations).

Furthermore, the physical residual functional capacity lacks the support of substantial evidence in the record. The ALJ relied only upon the findings of Dr. Sheehy, a non-examining physician, whose

opinion is not substantial evidence in this action. *See Pitzer v. Sullivan,* 908 F.2d 502, 506 (9th Cir. 1990) ("non-examining physicians' conclusion[s], with nothing more" do not constitute substantial evidence); *see also Spencer v. Heckler*, 765 F.2d 1090, 1093-94 (11th Cir. 1985) ("reports of physicians who do not examine the claimant, taken alone, do not constitute substantial evidence on which to base an administrative decision").

## CONCLUSION AND ORDER

For the reasons set forth above, the Court finds the ALJ erred in evaluating the medical evidence, and the physical residual functional capacity identified by the ALJ lacks the support of substantial evidence in the record. Therefore, the Court should not uphold the ALJ's decision. *See Sanchez*, 812 F.2d at 510. Because the Court finds remand is appropriate on these matters, it declines to address the remaining issues raised by Plaintiff in her opening brief.

Accordingly, the Court **ORDERS**:

1.      The matter is **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this decision; and

2.      The Clerk of Court **IS DIRECTED** to enter judgment in favor of Plaintiff Haylee Faith Nutter and against Defendant, Nancy A. Berryhill, Acting Commissioner of Social Security.

IT IS SO ORDERED.

Dated:   __**August 22, 2018**__                _____**/s/ Jennifer L. Thurston**_____
                                                                            UNITED STATES MAGISTRATE JUDGE